1

2

3

4

5

6

7

8

9

10

11

THORPE SHWER, P.C.
William L. Thorpe (No. 005641)
Jamie Gill Santos (No. 026251)
3200 North Central Avenue, Suite 1560
Phoenix, Arizona  85012-2441
Telephone:  (602) 682-6100
Email:  docket@thorpeshwer.com
Email:  wthorpe@thorpeshwer.com
Email:  jsantos@thorpeshwer.com


RIVKIN RADLER, LLP
Barry I. Levy (to be admitted *pro hac vice*)
Steven Henesy (to be admitted *pro hac vice*)
Michael Vanunu (to be admitted *pro hac vice*)
926 RXR Plaza
Uniondale, New York 11556
Telephone: (516) 357-3000
Email: barry.levy@rivkin.com
Email: steven.henesy@rivkin.com
Email: michael.vanunu@rivkin.com

12

13

14

*Counsel for Plaintiffs Government Employees Insurance Co.,
GEICO Indemnity Co., GEICO General Insurance Co., and
GEICO Casualty Co.*

### IN THE UNITED STATES DISTRICT COURT

### FOR DISTRICT OF ARIZONA

| | |
|---|---|
| Government Employees Insurance Co., GEICO Indemnity Co.; GEICO General Insurance Company and GEICO Casualty Co., | NO. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| Advantage Auto Glass, LLC, and Jeremy Solheim | |
| Defendants. | |

Plaintiffs  Government  Employees  Insurance  Co.,  GEICO  Indemnity  Co.,  GEICO

General  Insurance  Company  and  GEICO  Casualty  Co.  (collectively  "GEICO"  or

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THORPE SHWER, P.C.

"Plaintiffs"), as and for their Complaint against the Defendants Advantage Auto Glass, LLC ("Advantage") and Jeremy Solheim ("Solheim") (collectively "Defendants"), hereby allege as follows:

## INTRODUCTION

1.     This action seeks to terminate an ongoing fraudulent scheme committed against GEICO and, more broadly, the Arizona automobile insurance industry, and to recover more than $650,000.00 that the Defendants have stolen from GEICO through the submission of thousands of fraudulent insurance claims seeking reimbursement for: (i) windshield replacement services (the "Glass Services"); (ii) the installation of windshield parts – including moldings, weather strips, sensors, glass spacers, and trims – attendant to the windshield replacements (the "Glass Parts"); and (iii) Advanced Driver Assistance System ("ADAS") re-calibration services (the "ADAS Services") allegedly provided to individuals who were eligible for glass repair/replacement coverage under comprehensive automobile insurance policies issued by GEICO ("Insureds").

2.     In addition to money damages, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $90,000.00 in outstanding claims for Glass Services, Glass Parts, and ADAS Services that have been submitted or caused to be submitted by the Defendants through Defendant Advantage Auto Glass, LLC ("Advantage"), because the claims were fraudulent in that they:

    (i)      involved charges for fraudulent and illusory Glass Services, Glass Parts, and ADAS Services that were never performed and/or provided in the first instance; and

    (ii)     involved the submission of fraudulent and fabricated purchase invoices in order to substantiate their charges for the Glass Services and Glass Parts

THORPE SHWER, P.C.

THORPE SHWER, P.C.

and to create the appearance that the Defendants had legitimately acquired the Glass Parts, when in fact they did not.

3.      As more fully described in this Complaint, the Defendants engineered a scheme to create the appearance that Advantage performed legitimate Glass Services and provided legitimate Glass Parts to Insureds in order to submit invoices to GEICO for payment under the Insureds' motor vehicle insurance policies. In reality, Solheim used Advantage as a vehicle through which he could submit a massive amount of fraudulent billing for goods and services which were never performed and/or provided in the first instance.

4.      The Defendants fall into the following categories:

(i)     Defendant Advantage is an Arizona limited liability company that was used by Solheim as a vehicle to submit the fraudulent billing to GEICO and other automobile insurers seeking payment for Glass Services, Glass Parts, and ADAS Services.

(ii)    Defendant Solheim is the operator and sole member of Advantage, and the individual who orchestrated and implemented the fraudulent scheme described in this Complaint.

5.      As discussed below, the Defendants at all relevant times have known that the charges for the Glass Services, Glass Parts, and ADAS Services that they submitted, or caused to be submitted, to GEICO were fraudulent in that they:

(i)     involved charges for illusory Glass Services, Glass Parts, and ADAS Services that were never performed and/or provided in the first instance; and

(ii)    involved the submission of fabricated purchase invoices in order to substantiate the Defendants' charges for the Glass Services and Glass Parts and to create the appearance that the Defendants had legitimately acquired the Glass Parts, when in fact they did not.

3

9087636

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Glass Services, Glass Parts, and ADAS Services that they billed to GEICO.

7.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the more than 1,000 fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO by means of wire transmission in interstate commerce.

8.      The Defendants' fraudulent scheme began as early January 2018 and has continued uninterrupted through the present day.

9.      As a result of the Defendants' scheme, GEICO has incurred damages of more than $650,000.00.

## THE PARTIES

### I.      Plaintiffs

10.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the state of Arizona.

### II.      Defendants

11.      Defendant Advantage is an Arizona limited liability company. Advantage was organized in Arizona on or about November 24, 2003. At all relevant times, Solheim was the sole owner and operator of Advantage. Advantage was and continues to be used

4

9087636

by Solheim as a vehicle to submit to GEICO and other automobile insurers thousands of fraudulent claims for Glass Services, Glass Parts, and ADAS Services.

12.     Defendant Solheim resides in and is a citizen of Arizona. Solheim owned and operated Advantage, which he used as a vehicle to submit thousands of fraudulent claims for Glass Services, Glass Parts, and ADAS Services to GEICO.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. §1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act)) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. §1367.

14.     Venue in this District is appropriate pursuant to 28 U.S.C. §1391, as the District of Arizona is the District (i) where one or more of the Defendants reside, and (ii) a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

15.     GEICO is an insurance company licensed and authorized to do business in the State of Arizona. GEICO underwrites automobile insurance in Arizona.

**I.     Automobile Insurance and Reimbursement for Glass Services**

9087636

THORPE SHWER, P.C.

16.     Though not required, a large percentage of Arizona automobile owners carry comprehensive insurance coverage. By law, any insurer who provides comprehensive coverage for a motor vehicle is required to provide the Insured with an option to cover the repair or replacement of damage to any safety equipment, which includes windshields. See Ariz. Rev. St. § 20-264.

17.     In the event of damage to the windshield of an Insured vehicle with comprehensive insurance coverage and complete safety equipment coverage, Arizona law requires insurers to replace or repair the damaged windshield without application of a deductible. See Ariz. Rev. St. § 20-264.

18.     An Insured can assign his or her right to complete safety equipment coverage benefits – i.e., coverage for windshield repair or replacement – to his/her preferred windshield repair/replacement shop in exchange for the shop's performance of the repair or replacement services.

19.     Then, pursuant to an assignment of benefits given by the Insured to the shop, the shop can perform the work, and submit its invoice for the repair or replacement, together with the work order number, directly to GEICO for payment. The submission is made using an electronic billing or facsimile transmission system in which the shop's invoice and supporting documents (e.g. dealership invoices for glass and parts purchased by the shop) is transmitted to GEICO via interstate wire transfer to its' claims processing vendor located in Columbus, Ohio.

20.     Arizona law generally permits automobile insurers such as GEICO only thirty (30) days from their receipt to handle a claim seeking payment for windshield

6

repair and/or replacement. See, e.g., Ariz. Rev. St. § 20-462(A). If insurers such as GEICO do not pay the claim within 30 days, or present some good reason for denying or investigating the claim, they can be liable to the Insured or the Insured's assignee for interest at the legal rate from the date the claim is received. See Id. While the 30-day claims handling period helps to ensure that legitimate claims are paid in a timely manner, it also creates perverse incentives for glass shops to engage in fraudulent practices, such as those employed by the Defendants.

21.     GEICO receives hundreds of windshield repair or replacement claims from Arizona Insureds and shops on a daily basis.

22.     Upon information and belief, other Arizona automobile insurers similarly receive a very high volume of windshield repair and replacement claims each day.

23.     Glass shops who engage in the types of fraudulent practices employed by the Defendants count on the volume of windshield repair and replacement claims, coupled with the limited amount of time in which insurers have to handle those claims, to shield their activity from timely discovery.

24.     In response to fraudulent windshield repair and replacement practices within Arizona, the legislature amended the Unfair Practices and Frauds Article of Arizona's Insurance Statutes to specifically identify and criminalize unlawful auto glass repair. See Ariz. Rev. St. §§ 20-463.01; 20-466.01.

25.     In particular, Section 20-463.01 was amended, effective July 29, 2010, to criminalize specific practices by the auto glass industry. See AZ House Committee

7

9087636

Minutes, February 1, 2010, noting that "the bill contains a list of the most common fraudulent practices by the auto glass industry."

26.     Specifically, Arizona Statute § 20-463.01(A)(1)(a) provides that it is an unlawful practice for a person who sells or repairs auto glass to knowingly submit a false claim to an insurer for auto glass repair or replacement or for related services if the services were not provided.

27.     Other unlawful acts by an auto glass seller or repairer include: (i) falsely signing on behalf of a policyholder a work order, insurance assignment form, or other related form in order to submit a claim to an insurer; and (ii) misrepresenting to a policy holder the price of the proposed repairs or replacement being billed to the insurer. See Ariz. Rev. St. §§ 20-463.01.

28.     In Arizona, the submission of a claim seeking insurance reimbursement that is based in part on a fraudulent misrepresentation renders the entire claim fraudulent and not reimbursable.

## II.     The Defendants' Fraudulent Scheme

29.     Beginning in January of 2018, the Defendants implemented a multi-tiered fraudulent scheme to generate over 1,000 fraudulent claims, and to bill GEICO for goods and services they never provided. That fraudulent scheme continues uninterrupted to this day.

30.     Defendants began operating in Arizona through Advantage many years ago. Prior to 2018, Advantage historically submitted a small number of claims to GEICO. By way of example, in 2017 Advantage submitted 274 claims to GEICO seeking

THORPE SHWER, P.C.

9087636

approximately $140,000 in payments. In 2016 Advantage submitted 132 claims to GEICO seeking approximately $64,000.00 in payments. By contrast, in 2018, Advantage submitted 807 claims to GEICO in seeking more than $537,000.00 in payments. Moreover, during the first two months of 2019, Advantage submitted 192 claims to GEICO seeking approximately $140,000.00 in payments.

31.     Not only did the number of claims submitted by Advantage significantly increase after the Defendants implemented their multi-tiered fraudulent scheme, but the average charge submitted to GEICO per claim significantly increased as well. For example, between 2015 and 2017, the average claim submitted to GEICO from Advantage was for approximately $500.00, while the average claim submitted to GEICO from Advantage between 2018 and the present was for more than $675.00.

32.     In the claims identified in Exhibit "1", the Defendants were in most instances contacted by Insureds whose vehicles were claimed to have required either a replacement or repair of their windshields.

33.     Once an Insured contacted Advantage, either the Insured, Advantage or both contacted GEICO in order to advise GEICO of their intention to submit a claim for a windshield replacement, and obtain a claim number.

34.     Thereafter, Advantage typically scheduled a date and time for one of its technicians to meet each Insured at Advantage's shop or an alternative designated location (e.g. a home or office) in order to perform a windshield replacement.

35.     After the replacement of an Insured's windshield, the Defendants would electronically submit an invoice and supporting documentation to GEICO seeking

THORPE SHWER, P.C.

9

9087636

reimbursement for the Glass Services, Glass Parts and ADAS Services that were claimed to have provided/performed. As discussed below, the claims on Exhibit "1" were fraudulent in that they falsely represented to GEICO that the Glass Services, Glass Parts, and/or ADAS Services had been performed and/or provided, when in fact they had not been.

**A.  Fraudulent Billing for ADAS Services that Were Never Performed in the First Instance**

36.    As set forth in Exhibit "1", in addition to the actual windshield repair or replacement, Advantage invoices submitted to GEICO would many times represent that the Insured was provided with an ADAS Service and seek payment for that service from GEICO in an amount of $250.00.

37.    Certain modern vehicles are equipped with various types of ADAS systems that will typically include a front-facing camera that is mounted on or near a windshield. The camera is used to help with specific types of ADAS systems with which vehicles are equipped, such as adaptive cruise control, forward collision warning, and lane departure warning systems ("LDWS").

38.    The type of ADAS system included with a vehicle – if any – depends on the year, make, model, and trim level of that particular vehicle.

39.    In a legitimate claim, the repair or replacement of a windshield may implicate the vehicle's ADAS system, and therefore require that the ADAS front-facing camera be re-calibrated.

40.    In a legitimate claim, ADAS system re-calibration is performed using devices such as the Pilkington Opti-Aim ("Opti-Aim"), which is a specific piece of

THORPE SHWER, P.C.

10

9087636

THORPE SHWER, P.C.

equipment used by a technician to re-calibrate the vehicle's ADAS system following a windshield replacement. Each Opti-Aim device is assigned a unique serial number by Pilkington, and the serial number appears on the report that the equipment generates in connection with the service.

41.   Furthermore, in a legitimate claim for ADAS Services, an ADAS system would be recalibrated in one of two manners. One method involves driving the vehicle at a set speed on well-marked roads to recalibrate the camera. The second method involves mounting an image on one or more targets in front of the vehicle during the recalibration process.

42.   In support of their claims for the purported ADAS Services, the Defendants systematically submitted reports to GEICO allegedly generated by an Opti-Aim device bearing serial number AR343993. In fact, the reports were fraudulent and the services were never performed as: (i) Defendants have never owned nor had access to Opti-Aim recalibration equipment, including the Opti-Aim device bearing serial number AR343993; and (ii) the Opti-Aim device bearing serial number AR343993 was actually purchased and used by a company doing business in Denver, Colorado.

43.   The Defendants claim submissions seeking payment for ADAS Services also represented to GEICO that they provided ADAS Services to Insureds having a wide variety of vehicles, and included an Opti-Aim report representing re-calibration of the LDWS feature of that particular vehicle. The Defendants' claim submissions were false, in addition to the fact that the Defendants never owned the equipment, because a large

9087636

number of the vehicles on which ADAS Services were performed were not actually equipped with LDWS.

44.     In further keeping with the fact that the claims for ADAS Services identified in Exhibit "1" were fraudulent, the Insureds never authorized or consented to the performance of the ADAS Services, much less to the Defendants submission of claims seeking reimbursement against their insurance policies for the alleged services.

45.     For example, before filing this Complaint, GEICO learned that the Defendants actually employed a practice in which they generate two (2) invoices in connection with each service call. Pursuant to Defendants' fraudulent practice, they:

     (i)     provide the Insured with an invoice that would not reference the ADAS Services, nor include a charge for those services; and

     (ii)    submit a separate invoice to GEICO falsely indicating that the ADAS Services had been actually performed.

Representative examples of the contradictory invoices are attached to this Complaint as Exhibit "2".

46.     In addition, Defendants routinely submitted Opti-Aim reports that purported to bear the signature of the Insureds, when in fact, the reports were never actually signed by the Insureds, but rather, by Defendants and/or their employees. Defendants forged the Insureds' signatures to create the false appearance that: (i) the ADAS Services had actually been performed; and (ii) the Insureds authorized those services.

THORPE SHWER, P.C.

9087636

THORPE SHWER, P.C.

47.    A review by GEICO of the Opti-Aim reports in connection with its investigation further confirmed that the ADAS Services were not actually performed – the reports indicate that:

> (i)    the ADAS Services were performed using the same calibration equipment on different vehicles at or around the same time, and
>
> (ii)    the ADAS Services reportedly took under five (5) minutes despite the fact that recalibrations, when performed in a legitimate setting, generally take thirty (30) minutes to one (1) hour to perform.

Representative examples of the fraudulent Opti-Aim reports are attached to this Complaint as Exhibit "3".

48.    In all of the claims for ADAS Services identified in Exhibit "1", the Defendants falsely represented they were entitled to reimbursement for the purported ADAS Services despite the fact that:

> (i)    the vehicles were not equipped with LDWS or any other ADAS system requiring re-calibration;
>
> (ii)    the Insureds had not authorized or consented to the performance of the putative ADAS Services or the resulting submission of claims for reimbursement submitted to GEICO;
>
> (iii)    the Insureds had not signed the Opti-Aim reports or any other document related to supposed ADAS Services, nor had they authorized anyone to do so on their behalf; and/or
>
> (iv)    the purported ADAS Services were never performed in the first instance.

49.    For example:

> (i)    On June 11, 2018, an Insured named MO authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on June 11, 2018. However, MO did not request or authorize re-calibration services on the LDWS of her vehicle, and did not sign any report or receipt related to any purported calibration of any of

13

9087636

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

her vehicle's LDWS. Nonetheless, on October 9, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to MO's vehicle on June 11, 2018. The claim falsely represented that: (a) Advantage re-calibrated MO's LDWS system; and (b) MO signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, MO never signed the corresponding Opti-Aim report or authorized anyone to do so on her behalf.

(ii)     On June 20, 2018, an Insured named LG authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on June 20, 2018. As of June 20, 2018, LG's vehicle was not equipped with LDWS, LG did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of her vehicle's safety features. Nonetheless, on October 9, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to LG's vehicle on June 20, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) LG signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, LG never signed the corresponding Opti-Aim report or authorized anyone to do so on her behalf.

(iii)    On July 18, 2018, an Insured named JM authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on July 18, 2018. As of July 18, 2018, JM's vehicle was not equipped with LDWS, JM did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on September 27, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to JM's vehicle on July 18, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) JM signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, JM never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

14

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(iv)     On August 3, 2018, an Insured named NC authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on August 3, 2018. However, NC did not request or authorize re-calibration services on the LDWS of her vehicle, and did not sign any report or receipt related to any purported calibration of any of her vehicle's LDWS. Nonetheless, on August 6, 2018, the Defendants submitted to GEICO a fraudulent claim seeking reimbursement of $250.00 for an ADAS Service purportedly provided to NC's vehicle on August 3, 2018. The claim falsely represented that: (a) Advantage re-calibrated NC's LDWS system; and (b) NC signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, NC never signed the corresponding Opti-Aim report or authorized anyone to do so on her behalf.

(v)      On August 17, 2018, an Insured named JH authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on August 17, 2018. As of August 17, 2018, JH's vehicle was not equipped with LDWS, JH did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on August 20, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to JH's vehicle on August 17, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) JH signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, JH never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

(vi)     On September 4, 2018, an Insured named CS authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on September 4, 2018. As of September 4, 2018, CS's vehicle was not equipped with LDWS, CS did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on December 5, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to CS's vehicle on September 4, 2018. The claim falsely

15

9087636

THORPE SHWER, P.C.

represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) CS signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, CS never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

(vii)    On September 19, 2018, an Insured named CL authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on September 19, 2018. However, CL did not request or authorize re-calibration services on the LDWS of her vehicleand did not sign any report or receipt related to any purported calibration of any of her vehicle's LDWS. Nonetheless, on September 24, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to CL's vehicle on September 19, 2018. The claim falsely represented that: (a) Advantage re-calibrated CL's LDWS system; and (b) CL signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, CL never signed the corresponding Opti-Aim report or authorized anyone to do so on her behalf.

(viii)   On September 24, 2018, an Insured named AB authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on September 24, 2018. As of September 24, 2018, AB's vehicle was not equipped with LDWS, AB did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on September 24, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to AB's vehicle on September 24, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) AB signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, AB never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

(ix)    On October 17, 2018, an Insured named GL authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on October 17, 2018. As of October 17, 2018, GL's

16

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

vehicle was not equipped with LDWS, GL did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on October 18, 2019, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to GL's vehicle on October 17, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) GL signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, GL never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

(x)     On October 25, 2018, an Insured named GP authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on October 25, 2018. However, GP did not request or authorize re-calibration services on the LDWS of his vehicle, and did not sign any report or receipt related to any purported calibration of any of his vehicle's LDWS. Nonetheless, on November 1, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to GP's vehicle on October 25, 2018. The claim falsely represented that: (a) Advantage re-calibrated GP's LDWS system; and (b) GP signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, GP never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

(xi)    On November 5, 2018 an Insured named AD authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on November 5, 2018. As of November 5, 2018, AD's vehicle was not equipped with LDWS, AD did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of her vehicle's safety features. Nonetheless, on November 7, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to AD's vehicle on November 5, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) AD signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been

17

performed or authorized. Moreover, AD never signed the corresponding Opti-Aim report or authorized anyone to do so on her behalf.

(xii)   On November 10, 2018, an Insured named CZ authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on November 10, 2018. As of November 10, 2018, CZ's vehicle was not equipped with LDWS, CZ did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on November 10, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to CZ's vehicle on November 10, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) CZ signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, CZ never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

(xiii)  On November 27, 2018, an Insured named WY authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on November 27, 2018. As of November 27, 2018, WY's vehicle was not equipped with LDWS, WY did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on November 28, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to WY's vehicle on November 27, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) WY signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, WY never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

(xiv)   On December 6, 2018, an Insured named KG authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on December 6, 2018. As of December 6, 2018, KG's vehicle was not equipped with LDWS, KG did not request or

THORPE SHWER, P.C.

18

9087636

authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on December 11, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to KG's vehicle on December 6, 2018. The claim falsely represented that: (a) Advantage re-calibrated a non-existent LDWS system; and (b) KG signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, KG never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

(xv)    On December 10, 2018, an Insured named AL authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on December 10, 2018. However, AL did not request or authorize re-calibration services on the LDWS of his vehicle, and did not sign any report or receipt related to any purported calibration of any of his vehicle's LDWS. Nonetheless, on December 11, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to AL's vehicle on December 10, 2018. The claim falsely represented that: (a) Advantage re-calibrated AL's LDWS system; and (b) AL signed an Opti-Aim report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, AL never signed the corresponding Opti-Aim report or authorized anyone to do so on his behalf.

50.    These are only representative examples. In virtually all of the claims for ADAS Services identified in Exhibit "1", the Defendants falsely represented that: (i) the vehicles were equipped with a LDWS safety feature, when in fact they were not; (ii) the Insureds authorized and consented to the performance of ADAS Services and the resulting billing to GEICO for such services, when in fact they had not; (iii) the Insureds signed the Opti-Aim report, when in fact they had not; and/or (iv) ADAS Services had been provided, when in fact they had not.

B.    **Billing for Glass Services and Glass Parts that were Never Legitimately Performed or Provided in the First Instance**

19

51.     In addition to the ADAS Services, the Defendants claimed to have provided and actually billed GEICO for Glass Services and Glass Parts, consisting of the replacement of windshields and parts that are attendant thereto.

52.     In order to receive reimbursement for the Glass Services and Glass Parts, the Defendants were required to provide GEICO with proof of their acquisition of those parts to substantiate their requested reimbursement. However, the Defendants never legitimately purchased the Glass Parts for which they sought reimbursement from GEICO.

53.     The Defendants knew that, without documentation substantiating their acquisition of the Glass Parts, they would be unable to submit large amounts of Glass Parts billing to GEICO. Therefore, the Defendants adopted a fraudulent practice to create the false appearance that they legitimately purchased the Glass Parts from reputable Arizona automobile dealerships and that, therefore, they were entitled to reimbursement for the Glass Parts and Glass Services.

54.     To accomplish that goal, the Defendants fabricated invoices – which they created to resemble legitimate purchase invoices from actual Arizona automobile dealerships – and which were designed to create the appearance that the Defendants actually purchased Glass Parts from the dealerships (the "Fraudulent Dealership Invoices").

55.     The Defendants created the Fraudulent Dealership Invoices to look as if they had actually been generated by the dealerships. Each invoice included the dealership name, a logo, and contact information for the dealership.

THORPE SHWER, P.C.

9087636

THORPE SHWER, P.C.

56.    Then, the Defendants would submit claims for reimbursement to GEICO seeking installation of Glass Parts and, in support of these claims, submitted the Fraudulent Dealership Invoices to GEICO via interstate wire transmission, falsely representing that they legitimately acquired the Glass Parts and were therefore entitled to reimbursement.

57.    However, in reality, virtually all of these invoices were fabricated by the Defendants to create the appearance that the Defendants: (i) purchased the windshields and attendant parts from a legitimate source; (ii) actually provided the billed-for Glass Services and Glass Parts; and, therefore (iii) were entitled to the reimbursement sought in the invoices for the Glass Services and Glass Parts submitted to GEICO.

58.    As part of its investigation, GEICO confirmed the fraudulent nature of the Fraudulent Dealership Invoices submitted by Advantage to support the claims identified within Exhibit "1". In this context, GEICO secured affidavits from the Arizona automobile dealerships alleged to have generated the invoices, which consistently indicate that the Defendants' Fraudulent Dealership Invoices were fabricated and did not represent legitimate transactions between the Defendants and the individual dealerships.

59.    For example:

(i)    On March 19, 2019, Dennis Cavanaugh executed an affidavit in which Dennis Cavanaugh indicated: (i) Dennis Cavanaugh reviewed seven invoices that Advantage provided to GEICO that were purportedly from Acura of Peoria; (ii) that the seven invoices from Acura of Peoria were not created by or submitted by Acura of Peoria or Acura of Peoria's employees; and (iii) that the goods described in the seven invoices from Acura of Peoria were never purchased by Advantage. Nonetheless, Advantage submitted the seven invoices from Acura of Peoria in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that

21

THORPE SHWER, P.C.

it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Acura of Peoria that was provided to the Insureds. In reality, the invoices from Acura of Peoria submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Acura of Peoria and Acura of Peoria never created the seven invoices submitted by Advantage to GEICO.

(ii)    On March 19, 2019, Eric Francis executed an affidavit in which Eric Francis indicated: (i) Eric Francis reviewed 14 invoices that Advantage provided to GEICO that were purportedly from Chapman BMW; (ii) that the 14 invoices from Chapman BMW were not created by or submitted by Chapman BMW or Chapman BMW's employees; and (iii) that the goods described in the 14 invoices from Chapman BMW were never purchased by Advantage. Nonetheless, Advantage submitted the 14 invoices from Chapman BMW in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Chapman BMW that was provided to the Insureds. In reality, the invoices from Chapman BMW submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Chapman BMW and Chapman BMW never created the 14 invoices submitted by Advantage to GEICO.

(iii)    On March 19, 2019, John Mollerup executed an affidavit in which John Mollerup indicated: (i) John Mollerup reviewed 61 invoices that Advantage provided to GEICO that were purportedly from Auto Nation Nissan a/k/a Power Nissan; (ii) that the 61 invoices from Power Nissan were not created by or submitted by Power Nissan or Power Nissan's employees; and (iii) that the goods described in the 61 invoices from Power Nissan were never purchased by Advantage. Nonetheless, Advantage submitted the 61 invoices from Power Nissan in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Power Nissan that was provided to the Insureds. In reality, the invoices from Power Nissan submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Power Nissan and Power Nissan never created the 61 invoices submitted by Advantage to GEICO.

(iv)    On March 20, 2019, Butch Lemen executed an affidavit in which Butch Lemen indicated: (i) Butch Lemen reviewed 29 invoices that

22

9087636

Advantage provided to GEICO that were purportedly from Berge Ford; (ii) that the 29 invoices from Berge Ford were not created by or submitted by Berge Ford or Berge Ford's employees; and (iii) that the goods described in the 29 invoices from Berge Ford were never purchased by Advantage. Nonetheless, Advantage submitted the 29 invoices from Berge Ford in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Berge Ford that was provided to the Insureds. In reality, the invoices from Berge Ford submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Berge Ford and Berge Ford never created the 29 invoices submitted by Advantage to GEICO.

(v)     On March 20, 2019, Todd McMahon executed an affidavit in which Todd McMahon indicated: (i) Todd McMahon reviewed 13 invoices that Advantage provided to GEICO that were purportedly from Berge Volkswagen; (ii) that the 13 invoices from Berge Volkswagen were not created by or submitted by Berge Volkswagen or Berge Volkswagen's employees; and (iii) that the goods described in the 13 invoices from Berge Volkswagen were never purchased by Advantage. Nonetheless, Advantage submitted the 13 invoices from Berge Volkswagen in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Berge Volkswagen that was provided to the Insureds. In reality, the invoices from Berge Volkswagen submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Berge Volkswagen and Berge Volkswagen never created the 13 invoices submitted by Advantage to GEICO.

(vi)    On March 20, 2019, Jerry Morgan executed an affidavit in which Jerry Morgan indicated: (i) Jerry Morgan reviewed 14 invoices that Advantage provided to GEICO that were purportedly from Cardinaleway Mazda; (ii) that the 14 invoices from Cardinaleway Mazda were not created by or submitted by Cardinaleway Mazda or Cardinaleway Mazda's employees; and (iii) that the goods described in the 14 invoices from Cardinaleway Mazda were never purchased by Advantage. Nonetheless, Advantage submitted the 14 invoices from Cardinaleway Mazda in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from

THORPE SHWER, P.C.

23

9087636

Cardinaleway Mazda that was provided to the Insureds. In reality, the invoices from Cardinaleway Mazda submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Cardinaleway Mazda and Cardinaleway Mazda never created the 14 invoices submitted by Advantage to GEICO.

(vii)     On March 20, 2019, Rich Choquette executed an affidavit in which Rich Choquette indicated: (i) Rich Choquette reviewed 15 invoices that Advantage provided to GEICO that were purportedly from Horne Kia; (ii) that the 15 invoices from Horne Kia were not created by or submitted by Horne Kia or Horne Kia's employees; and (iii) that the goods described in the 15 invoices from Horne Kia were never purchased by Advantage. Nonetheless, Advantage submitted the 15 invoices from Horne Kia in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Horne Kia that was provided to the Insureds. In reality, the invoices from Horne Kia submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Horne Kia and Horne Kia never created the 15 invoices submitted by Advantage to GEICO.

(viii)    On March 20, 2019, Ben Smihula executed an affidavit in which Ben Smihula indicated: (i) Ben Smihula reviewed 11 invoices that Advantage provided to GEICO that were purportedly from Superstition Springs Lexus; (ii) that the 11 invoices from Superstition Springs Lexus were not created by or submitted by Superstition Springs Lexus or Superstition Springs Lexus's employees; and (iii) that the goods described in the 11 invoices from Superstition Springs Lexus were never purchased by Advantage. Nonetheless, Advantage submitted the 11 invoices from Superstition Springs Lexus in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Superstition Springs Lexus that was provided to the Insureds. In reality, the invoices from Superstition Springs Lexus submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Superstition Springs Lexus and Superstition Springs Lexus never created the 11 invoices submitted by Advantage to GEICO.

(ix)      On March 20, 2019, David Johnson executed an affidavit in which David Johnson indicated: (i) David Johnson reviewed seven invoices that Advantage provided to GEICO that were purportedly from

24

THORPE SHWER, P.C.

9087636

Mercedes Benz of Scottsdale; (ii) that the seven invoices from Mercedes Benz of Scottsdale were not created by or submitted by Mercedes Benz of Scottsdale or Mercedes Benz of Scottsdale's employees; and (iii) that the goods described in the seven invoices from Mercedes Benz of Scottsdale were never purchased by Advantage. Nonetheless, Advantage submitted the seven invoices from Mercedes Benz of Scottsdale in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Mercedes Benz of Scottsdale that was provided to the Insureds. In reality, the invoices from Mercedes Benz of Scottsdale submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Mercedes Benz of Scottsdale and Mercedes Benz of Scottsdale never created the seven invoices submitted by Advantage to GEICO.

(x)     On March 26, 2019, Sherman White executed an affidavit in which Sherman White indicated: (i) Sherman White reviewed 48 invoices that Advantage provided to GEICO that were purportedly from Auto Nation Chevrolet; (ii) that the 48 invoices from Auto Nation Chevrolet were not created by or submitted by Auto Nation Chevrolet or Auto Nation Chevrolet's employees; and (iii) that the goods described in the 48 invoices from Auto Nation Chevrolet were never purchased by Advantage. Nonetheless, Advantage submitted the 48 invoices from Auto Nation Chevrolet in conjunction with its claims to GEICO to support Advantage's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that Advantage purchased Glass Parts from Auto Nation Chevrolet that was provided to the Insureds. In reality, the invoices from Auto Nation Chevrolet submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Auto Nation Chevrolet and Auto Nation Chevrolet never created the 48 invoices submitted by Advantage to GEICO.

The affidavits and fraudulent invoices that are referenced in ¶¶ 59(i) through (x) are attached to this Complaint as Exhibits "4(a) through 4(j)".

60.     Once the Defendants generated the Fraudulent Dealership Invoices, they submitted those invoices in support of their claims for the Glass Services and Glass Parts, falsely representing that they were entitled to reimbursement.

61.     For example:

(i)     On July 11, 2018, an Insured named MM authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On July 11, 2018 Advantage only replaced MM's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to MM. Nonetheless, on October 11, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a sensor in the amount of $284.90. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Cardinaleway Mazda. The claim falsely represented that: (a) Advantage purchased a sensor from Cardinaleway Mazda; and (b) Advantage provided MM with a sensor. In reality, Advantage never purchased the Glass Parts from Cardinaleway Mazda and, thus, never provided them to MM.

(ii)    On July 20, 2018, an Insured named JM authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On July 20, 2018 Advantage only replaced JM's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to JM. Nonetheless, on July 26, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a seal in the amount of $23.50; and (ii) a module in the amount of $119.00. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Mercedes Benz of Scottsdale. The claim falsely represented that: (a) Advantage purchased a seal and module from Mercedes Benz of Scottsdale; and (b) Advantage provided JM with a seal and module. In reality, Advantage never purchased the Glass Parts from Mercedes Benz of Scottsdale and, thus, never provided them to JM.

(iii)   On August 3, 2018, an Insured named NC authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On August 3, 2018 Advantage only replaced NC's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to NC. Nonetheless, on August 6, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) three moldings totaling $93.22; and (ii) a sensor in the amount of $297.29. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Superstition Springs Lexus. The claim falsely represented that: (a) Advantage purchased a sensor and moldings from Superstition Springs Lexus; and (b) Advantage provided NC with a sensor and moldings. In reality, Advantage never purchased

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9087636

the Glass Parts from Superstition Springs Lexus and, thus, never provided it to NC.

(iv)     On August 15, 2018, an Insured named DS authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On August 15, 2018 Advantage only replaced DS's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to DS. Nonetheless, on August 17, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a molding in the amount of $28.59; (ii) a sensor in the amount of $247.70; and (iii) two windshield covers totaling $170.07. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Chapman BMW. The claim falsely represented that: (a) Advantage purchased a sensor, a molding, and two windshield covers from Chapman BMW; and (b) Advantage provided DS with a sensor, a molding, and two windshield covers. In reality, Advantage never purchased the Glass Parts from Chapman BMW and, thus, never provided them to DS.

(v)     On August 17, 2018, an Insured named JH authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On August 17, 2018 Advantage only replaced JH's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to JH. Nonetheless, on August 20, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) two moldings totaling $67.85; and (ii) two retainers totaling $42.88. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Berge Ford. The claim falsely represented that: (a) Advantage purchased two moldings and two retainers from Berge Ford; and (b) Advantage provided JH with two moldings and two retainers. In reality, Advantage never purchased the Glass Parts from Berge Ford and, thus, never provided it to JH.

(vi)     On September 22, 2018, an Insured named SN authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On September 22, 2018 Advantage only replaced SN's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to SN. Nonetheless, on October 1, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a molding in the amount of $79.95. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Subaru Superstore of Chandler. The claim falsely represented that: (a) Advantage

27

9087636

THORPE SHWER, P.C.

purchased a molding from Subaru Superstore of Chandler; and (b) Advantage provided SN with a molding. In reality, Advantage never purchased the Glass Parts from Subaru Superstore of Chandler and, thus, never provided it to SN.

(vii)   On October 3, 2018, an Insured named JV authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On October 3, 2018 Advantage only replaced JV's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to JV. Nonetheless, on October 23, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for three moldings totaling $455.00. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Audi Chandler. The claim falsely represented that: (a) Advantage purchased three moldings from Audi Chandler; and (b) Advantage provided JV with three moldings. In reality, Advantage never purchased the Glass Parts from Audi Chandler and, thus, never provided them to JV.

(viii)  On October 8, 2018, an Insured named LH authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On October 8, 2018 Advantage only replaced LH's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to LH. Nonetheless, on October 8, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a dam in the amount of $23.62; and (ii) three moldings totaling $398.80. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Power Nissan. The claim falsely represented that: (a) Advantage purchased a dam and moldings from Power Nissan; and (b) Advantage provided LH with a dam and moldings. In reality, Advantage never purchased the Glass Parts from Power Nissan and, thus, never provided them to LH.

(ix)    On October 18, 2018, an Insured named SB authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On October 18, 2018 Advantage only replaced SB's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to SB. Nonetheless, on October 24, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a sensor in the amount of $284.90. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Cardinaleway Mazda. The claim falsely represented that: (a) Advantage purchased a sensor from Cardinaleway Mazda; and (b) Advantage provided SB with a

28

THORPE SHWER, P.C.

sensor. In reality, Advantage never purchased the Glass Parts from Cardinaleway Mazda and, thus, never provided it to SB.

(x)    On November 5, 2018, an Insured named AD authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On November 5, 2018 Advantage only replaced AD's windshield. Besides the windshield, Advantage did not install or provide any Glass Parts to AD. Nonetheless, on November 7, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a dam in the amount of $62.58; and (ii) two moldings totaling $78.93. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Acura of Peoria. The claim falsely represented that: (a) Advantage purchased a dam and moldings from Acura of Peoria; and (b) Advantage provided AD with a dam and molding. In reality, Advantage never purchased the Glass Parts from Acura of Peoria and, thus, never provided them to AD.

62.    These are only representative examples. In the claims for Glass Services and Glass Parts identified in Exhibit "1", the Defendants routinely submitted the Fraudulent Dealership Invoices in support of their claims in order to create the appearance that they legitimately acquired the Glass Parts, when in fact they had not.

63.    Moreover, the billed for Glass Parts were largely never provided. For example, in many cases, the Defendants would be authorized to provide – and purported to provide – windshield replacement services to Insureds without authorization to perform or provide any additional services. Then, following these limited services, the Defendants would submit invoices to GEICO which falsely represented that they installed a series of Glass Parts, supposedly attendant to the windshield replacements, which were never actually provided or installed.

64.    For example:

(i)    On July 11, 2018, an Insured named MM authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for

29

9087636

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the replacement service. On July 11, 2018 Advantage only replaced MM's windshield. Besides the windshield, MM did not authorize Advantage to install any Glass Parts, nor were any Glass Parts provided to MM. Nonetheless, on October 11, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a sensor in the amount of $284.90. The claim falsely represented that: (a) Advantage provided MM with a sensor; and (b) MM permitted Advantage to install a sensor in MM's vehicle and submit a claim to GEICO for the installation of that part. In reality, the Glass Part was never provided to MM or authorized to install on her vehicle.

(ii)     On July 20, 2018, an Insured named JM authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On July 20, 2018 Advantage only replaced JM's windshield. Besides the windshield, JM did not authorize Advantage to install any Glass Parts, nor were any Glass Parts provided to JM. Nonetheless, on July 26, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a seal in the amount of $23.50; and (ii) a module in the amount of $119.00.  The claim falsely represented that: (a) Advantage provided JM with a seal and a module; and (b) JM permitted Advantage to install a seal and a module in JM's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to JM authorized to install on his vehicle.

(iii)    On August 3, 2018, an Insured named NC authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On August 3, 2018 Advantage only replaced NC's windshield. Besides the windshield, NC did not authorize Advantage to install any Glass Parts, nor were any Glass Parts provided to NC. Nonetheless, on August 6, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) three moldings totaling $93.22; and (ii) a sensor in the amount of $297.29. The claim falsely represented that: (a) Advantage provided NC with a sensor and moldings; and (b) NC permitted Advantage to install a sensor and moldings in NC's vehicle and submit a claim to GEICO for the installation of the parts. In reality, the Glass Parts were never provided to NC or authorized to install on her vehicle.

(iv)     On August 15, 2018, an Insured named DS authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On August 15, 2018 Advantage only replaced DS's windshield. Besides the windshield, DS did not authorize Advantage to install any Glass Parts, nor were any Glass

30

Parts provided to DS. Nonetheless, on August 17, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a molding in the amount of $28.59; (ii) a sensor in the amount of $247.70; and (iii) two windshield covers totaling $170.07. The claim falsely represented that: (a) Advantage provided DS with a sensor, a molding, and two windshield covers; and (b) DS permitted Advantage to install a sensor, a molding, and two windshield covers in DS's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to DS or authorized to install on his vehicle.

(v)     On August 17, 2018, an Insured named JH authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On August 17, 2018 Advantage only replaced JH's windshield. Besides the windshield, JH did not authorize Advantage to install any Glass Parts, nor were any Glass Parts provided to JH. Nonetheless, on August 20, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) two moldings totaling $67.85; and (ii) two retainers totaling $42.88. The claim falsely represented that: (a) Advantage provided JH with two moldings and two retainers; and (b) JH permitted Advantage to install two moldings and two retainers in JH's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to JH or authorized to install on his vehicle.

(vi)    On September 22, 2018, an Insured named SN authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On September 22, 2018 Advantage only replaced SN's windshield. Besides the windshield, SN did not authorize Advantage to install any Glass Parts, nor were any Glass Parts provided to SN. Nonetheless, on October 1, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a molding in the amount of $79.95.The claim falsely represented that: (a) Advantage provided SN with a molding; and (b) SN permitted Advantage to install a molding in SN's vehicle and submit a claim to GEICO for the installation of that part. In reality, the Glass Part were never provided to SN or authorized to install on his vehicle.

(vii)   On October 3, 2018, an Insured named JV authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On October 3, 2018 Advantage only replaced JV's windshield. Besides the windshield, JV did not authorize Advantage to install any Glass Parts, nor were any Glass

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Parts provided to JV. Nonetheless, on October 23, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for three moldings totaling $455.00. The claim falsely represented that: (a) Advantage provided JV with three moldings; and (b) JV permitted Advantage to install a three moldings in JV's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to JV or authorized to install on his vehicle.

(viii)   On October 8, 2018, an Insured named LH authorized Advantage to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On October 8, 2018 Advantage only replaced LH's windshield. Besides the windshield, LH did not authorize Advantage to install any Glass Parts, nor were any Glass Parts provided to LH. Nonetheless, on October 8, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a dam in the amount of $23.62; and (ii) three moldings totaling $398.80. The claim falsely represented that: (a) Advantage provided LH with a dam and moldings; and (b) LH permitted Advantage to install a dam and moldings in LH's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to LH or authorized to install on her vehicle.

(ix)   On October 18, 2018, an Insured named SB authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On October 18, 2018 Advantage only replaced SB's windshield. Besides the windshield, SB did not authorize Advantage to install any Glass Parts, nor were any Glass Parts provided to SB. Nonetheless, on October 24, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a sensor in the amount of $284.90. The claim falsely represented that: (a) Advantage provided SB with a sensor; and (b) SB permitted Advantage to install a sensor in SB's vehicle and submit a claim to GEICO for the installation of that part. In reality, the Glass Part was never provided to SB or authorized to install on his vehicle.

(x)   On November 5, 2018, an Insured named AD authorized Advantage to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On November 5, 2018 Advantage only replaced AD's windshield. Besides the windshield, AD did not authorize Advantage to install any Glass Parts, nor were any Glass Parts provided to AD. Nonetheless, on November 7, 2018, the Defendants submitted a fraudulent claim to GEICO seeking

32

reimbursement for: (i) a dam in the amount of $62.58; and (ii) two moldings totaling $78.93. The claim falsely represented that: (a) Advantage provided AD with a dam and two moldings; and (b) AD permitted Advantage to install a dam and two moldings in AD's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to AD or authorized to install on her vehicle.

65.   These are only representative examples. In the claims for Glass Parts identified in Exhibit "1", the Defendants routinely represented that they had provided and installed Glass Parts attendant to the windshield replacements, when in fact they had not.

**III.   The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

66.   To support the fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of claims to GEICO through Advantage seeking payment for Glass Services and Glass Parts that were never provided by the Defendants.

67.   All of the claims for Glass Services, Glass Parts, and ADAS Services identified in Exhibit "1" were submitted by Defendants via electronic transmission from Arizona to GEICO's claims processing vendor in Columbus, Ohio.

68.   The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)   The claims submitted by the Defendants submitted through Advantage falsely represented that the Glass Services, Glass Parts, and ADAS Services were legitimately performed and/or provided, when in fact they were not; and

(ii)   The claims submitted by the Defendants through Advantage falsely represented that Advantage had acquired the Glass Parts they purported to install for Insureds, when in fact they had not.

THORPE SHWER, P.C.

33

9087636

1

2

**IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

3       69.    The Defendants were legally and ethically obligated to act honestly and

4  with integrity in connection with their performance of the purported Glass Services,

5  Glass Parts, and ADAS Services, and their submission of charges to GEICO.

6       70.    To induce GEICO to promptly pay the fraudulent charges for the Glass

7  Services, Glass Parts, and ADAS Services, the Defendants systemically concealed their

8  fraud and have gone to great lengths to accomplish this concealment.

9       71.    Specifically, the Defendants created, or caused the creation of, the

10  Fraudulent Dealership Invoices which purported to support the submission of claims for

11  Glass Parts in order to create the false impression that the Glass Services and Glass Parts

12  had been performed and/or provided by the Defendants, and that the Defendants had

13  incurred some legitimate costs in acquiring the Glass Parts.

14       72.    Additionally, the Defendants created and submitted Opti-Aim reports to

15  GEICO which purported to support the submission of claims for the ADAS Services in

16  order to create the false impression that the ADAS Services had been authorized by the

17  Insureds, that the Insureds had signed the Opti-Aim reports, the Insureds' vehicles were

18  equipped with an ADAS feature which required re-calibration, and that the ADAS

19  Services were legitimately performed in the first instance.

20       73.    GEICO is under statutory and contractual obligations to promptly and fairly

21  process claims within 30 days. The facially-valid documents submitted to GEICO in

22  support of the fraudulent charges at issue, combined with the material misrepresentations

THORPE SHWER, P.C.

34

9087636

THORPE SHWER, P.C.

described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $650,000.00.

74.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraudulent conduct from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
### Against Advantage
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

75.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 74 above.

76.     There is an actual case in controversy between GEICO and Advantage regarding more than $90,000.00 in fraudulent claims for the purported Glass Services, Glass Parts, and ADAS Services that has been submitted to GEICO.

77.     Advantage has no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that Advantage provided the underlying services, when in fact they did not.

78.     Advantage has no right to receive payment for any pending bills submitted to GEICO because the bills misrepresented the specific Glass Services, Glass Parts, and ADAS Services that Advantage purported to provide the Insureds.

79.     Advantage has no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that the billed-for services actually constituted legitimate windshield repairs and replacements, when in fact they did not.

9087636

80.    Advantage has no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that the billed-for services were actually provided, when in fact they were not.

81.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Advantage has no right to receive payment for any pending claims submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Solheim
### (Violation of RICO, 18 U.S.C. § 1962(c))

82.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 81 above.

83.    Advantage is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

84.    Solheim has knowingly conducted and/or participated, directly or indirectly, in the conduct of Advantage's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted thousands of fraudulent claims for Glass Services, Glass Parts, and ADAS Services on a continuous basis for more than one year seeking insurance payments under GEICO insurance policies that Advantage was never entitled to receive because: (i) the Glass Services never had any legitimate reparative value, and were never performed in the first instance; (ii) the ADAS Services never had any legitimate reparative value, and were never provided in the first instance; and (iii) the Glass Parts never had any legitimate

THORPE SHWER, P.C.

36

9087636

reparative value, and a vast majority of the Glass Parts were never provided in the first instance. A representative sample of the fraudulent bills and corresponding facsimiles submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

85.     Advantage's business is racketeering activity, inasmuch as the enterprise exists solely for the purpose of submitting fraudulent charges to Arizona automobile insurers. The predicate acts of wire fraud are the regular way in which Solheim operated Advantage, insofar as Advantage was never eligible to bill GEICO or other automobile insurers for the Glass Services Glass Parts, and ADAS Services, and the acts of wire fraud therefore are essential in order for Advantage to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of wire fraud implies a threat of continued criminal activity, as does the fact that attempts to collect on the fraudulent billing submitted through Advantage continue to the present day.

86.     Advantage is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Advantage in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent billing of Glass Services and Glass Parts.

87.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $650,000.00 pursuant to the fraudulent claims submitted through Advantage.

THORPE SHWER, P.C.

9087636

88.    By reason of its injury GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorneys' fees, and court costs pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Solheim**
**(Violation of Ariz. Rev. Stat. § 13-2314-04)**

89.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 88 above.

90.    In furtherance of the fraudulent claims identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1", the Defendants submitted or caused to be submitted over 1,000 fraudulent invoices and supporting paperwork to GEICO in order to obtain reimbursement from private motor vehicle insurance policies.

91.    When the claims for reimbursement were submitted to GEICO, the Defendants knew that the submission of invoices and supporting paperwork contained false and misleading information concerning facts material to GEICO's determination to pay claims, including misrepresentations that: (i) Advantage performed Glass Services to the Insureds, when such Glass Services were never performed in the first instance; (ii) Advantage performed ADAS Services to the Insureds by submitting Opti-Aim reports containing the Insureds' signatures, when the Insureds never signed such Opti-Aim reports and the ADAS Services were never performed in the first instance; (iii) Advantage provided Glass Parts to the Insureds, when at least – if not all – of the Glass Parts were never provided in the first instance; and (iv) Advantage purchased specific

THORPE SHWER, P.C.

9087636

THORPE SHWER, P.C.

Glass Parts from automotive dealerships that were purportedly provided to the Insureds when Advantage never purchased the specific Glass Parts.

92.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Ariz. Rev. Stat. §§ 20-463(A)(1)(a);    20-463(A)(5);    20-463.01(A)(1)(a);    20-463.01(A)(3);    and    20-463.01(A)(4)(a).

93.    This pattern of racketeering activity resulted in GEICO issuing payment for the reimbursement of thousands of claims that it otherwise would not have provided reimbursement for.

94.    Defendants' pattern of racketeering activity has caused GEICO to sustain damages of at least $650,000.00.

95.    By reason of Defendants' conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorneys' fees, and court costs pursuant to Ariz. Rev. Stat. § 13-2314-04.

**FOURTH CAUSE OF ACTION**
**Against Advantage and Solheim**
**(Common Law Fraud)**

96.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 95 above.

97.    Advantage and Solheim intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts in the course of their submission of fraudulent claims to GEICO for reimbursement.

98.    The false and fraudulent statements of material fact and acts of fraudulent concealment include the misrepresentations that: (i) Advantage performed Glass Services

to the Insureds, when such Glass Services were never performed in the first instance; (ii) Advantage performed ADAS Services to the Insureds by submitting Opti-Aim reports containing the Insureds' signatures, when the Insureds never signed such Opti-Aim reports and the ADAS Services were never performed in the first instance; (iii) Advantage provided Glass Parts to the Insureds, when at least – if not all – of the Glass Parts were never provided in the first instance; and (iv) Advantage purchased specific Glass Parts from automotive dealerships that were purportedly provided to the Insureds when Advantage never purchased the specific Glass Parts.

99.     Advantage and Solheim intentionally made the above-described false and fraudulent statements and concealed material facts from GEICO in a calculated effort to mislead GEICO and induce GEICO to pay for reimbursement claims that it would not otherwise have provided.

100.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $650,000.00 in the reimbursement of claims made by Advantage.

101.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

102.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

THORPE SHWER, P.C.

9087436

THORPE SHWER, P.C.

**FIFTH CAUSE OF ACTION**
**Against Advantage and Solheim**
**(Unjust Enrichment)**

103.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 102 above.

104.   As set forth above, Advantage and Solheim have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

105.   When GEICO paid the invoices provided by the Defendants submitted for reimbursement, it reasonably believed that the Glass Parts, Glass Services, and ADAS Services were provided to the Insureds based upon the invoices and the submission of additional supporting documentation such as the Opti-Aim reports and dealership-invoices.

106.   Absent the misrepresentations by Advantage and Solheim, GEICO would not have issued the payment for the claims identified in Exhibit "1".

107.   Therefore, GEICO's payment of the claims submitted by the Defendants through Advantage resulted in the Defendants being unjustly enriched, as the Defendants received payment for claims they submitted to GEICO, which should not have been paid since the Glass Services, Glass Parts, and ADAS Services were never provided to the Insureds.

108.   Advantage and Solheim's enrichment was at GEICO's expense, as GEICO paid the Defendants, through Advantage more than $650,000.00 since January 2018.

109.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $650,000.00.

9087636

# JURY DEMAND

110.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Advantage, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Advantage has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Solheim, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $650,000.00, together with treble damages, costs, interest and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

C.    On the Third Cause of Action against Solheim, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $650,000.00, together with treble damages, costs, interest and reasonable attorneys' fees pursuant to Ariz. Rev. Stat. § 13-2314-04;

D.    On the Fourth Cause of Action against Advantage and Solheim, compensatory damages in an amount to be determined at trial but in excess of $650,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

42

1    F.    On the Fifth Cause of Action against Advantage and Solheim,

2 compensatory damages in favor of GEICO in an amount to be determined at trial but in

3 excess of $650,000.00, plus costs, interest and such other and further relief as this Court

4 deems just and proper.

5

6        Dated this 29th day of April, 2019.

7

8                        **THORPE SHWER, P.C.**

9                        By: /s/ *William L. Thorpe*

10                            William L. Thorpe
                             Jamie Gill Santos

11

12                        AND

13                            Barry I. Levy (to be admitted *pro hac vice*)

14                            Steven Henesy (to be admitted *pro hac vice*)
                             Michael Vanunu (to be admitted *pro hac*

15                            *vice*)
                             **RIVKIN RADLER LLP**

16

17                            *Counsel for Plaintiffs, Government Employees*

18                            *Insurance Co., GEICO Indemnity Co., GEICO*
                             *General Insurance Company and GEICO*
                             *Casualty Co.*

19

20

21

22

23

24

25

26

27

28

9087636

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2019, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.

*/s/  Rebecca Camelio*
_____

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9087636